The State ex rel. Fourth National Bank of Philadelphia and others vs. Johnson, Circuit Judge.

*July 3 — July 5, 1899.*

*Constitutional law: Jurisdiction of supreme court: Superintending control over inferior courts: Trial of issues of fact: Mandamus: Certiorari as ancillary writ: Voluntary assignment: Final report of assignee: Inspection of books, etc., by creditors: Discretion.*

1. Sec. 3, art. VII, Const., contains three separate grants of jurisdiction to the supreme court, namely, (1) appellate jurisdiction; (2) superintending control over inferior courts; (3) original jurisdiction, exercised by means of writs, to protect the sovereignty of the state, preserve the liberty of the people, and secure the rights of its citizens.

2. By the constitutional grant of a general superintending control over all inferior courts, the supreme court is endowed with a separate and independent jurisdiction, which enables and requires it, in a proper case, to control the course of ordinary litigation in such inferior courts, and it also took, at the same time, all the ancient

| | |
|---|---|
| 103 | 591 |
| d104 | 230 |
| 104 | 251 |
| 103 | 591 |
| 105 | 93 |
| 105 | 176 |
| 105 | 177 |
| 103 | 591 |
| 106 | 230 |
| e106 | 234 |
| e106 | 237 |
| 103 | 591 |
| 108 | 79 |
| 103 | 591 |
| 109 | 627 |
| 103 | 591 |
| 111 | ,²387 |
| 103 | 591 |
| f112 | ²234 |
| 112 | ²236 |
| 112 | ¹299 |
| 112 | ²300 |
| 112 | ⁷574 |
| 112 | ⁷575 |
| 103 | 591 |
| s51 LRA | 33n |
| 51 LRA | 958n |
| 103 | 591 |
| 117 | ⁴424 |
| 117 | ⁴672 |

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

common-law writs necessary to enable it to exercise that high power, including the writs of *mandamus*, prohibition, *certiorari*, and *procedendo*, and the right to hear and determine the cause when the writ has brought it before the court, including the determination of questions of fact; and no part of that power can be taken away by a statute attempting to regulate the trial of questions of fact in that court.

3. An insolvent bank with nominal assets of over $1,500,000, and debts of nearly the same amount, made an assignment for the benefit of creditors to its vice president. For over five years the assignee rendered no account of his administration, and then, pursuant to an order of court, he filed an account, which was duly noticed for hearing. Said account consisted principally of a transcript of his cash account, which was nowhere footed, and which utterly failed to state the property received by him or the manner of his dealing therewith; and the amount realized, and the condition of the funds and property in his possession, could only be determined, if at all, by the aid of expert accountants. General objections thereto were made by creditors, who also moved to have it made more definite and certain. Such account was not treated as a final account upon the hearing by the circuit court, and the creditors acted thereafter under the belief that a final account was to be filed. The court took the matter under advisement, and nine months thereafter, without notice, confirmed the account (except as to the assignee's compensation) as a full accounting of all acts up to the date of its filing. The following day the assignee's resignation was filed and accepted, to take effect on the final confirmation of his account. The assignee thereupon moved to set aside an order, which had been made by a court commissioner at the instance of certain creditors, requiring the assignee and the officers of the assignor to submit to an examination, and the creditors moved to set aside the orders confirming the assignee's account, accepting his resignation, etc., and for an order allowing examination of the books and of the bank officers before the court. One month thereafter the court granted the motion of the assignee and denied those of the creditors, and at the same time denied the motion of the creditors, made nearly a year before, to have the assignee's account made more definite and certain. *Held*, that said account filed by the assignee was not the final report and account contemplated and required by sec. 1701, Stats. 1898, and any creditor was entitled to have it made more definite and certain before being required to file specific objections to it.

4. A final order settling an assignee's account, under sec. 1701, Stats.

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

1898, cannot properly be made until the duties of the trust have been fully performed.

5. No final report and account, within the meaning of the statute, having been filed, the rights of a creditor to have an inspection of the books of the assignor and an examination of the assignor and other witnesses under sec. 1693b was absolute and not discretionary.

6. Aside from the statute, the right of a creditor to have an examination of the assignee under oath as to his dealings with the estate, under reasonable restrictions, is absolute, and a refusal to allow such examination prior to the approval of the final account can only be regarded as an abuse of discretion.

7. Under the superintending power given the supreme court by the constitution (sec. 3, art. VII), that court may, by *mandamus*, compel an inferior court to perform a duty imposed by statute which is not discretionary in its nature, and may also compel action in cases where discretion is to be exercised, when it clearly appears that such discretion has not in fact been exercised, or that action has been taken in manifest disregard of duty or without semblance of legal power, and where it further appears that there is no remedy by appeal, or that such remedy, if existing, is entirely inadequate, and the exigency is of such an extreme nature as to justify the interposition of such extraordinary superintending power.

8. It appearing in this case that a large portion of the assigned assets consisted of commercial paper; that such of the paper as was still uncollected and had not been sued on would become barred by the statute of limitations within a few months of the date of the order of the circuit court denying the relief sought by the creditors; and that an appeal could not in due course be heard for several months, an appeal is *held* not to afford such adequate remedy as would prevent a resort to *mandamus*.

9. The refusal to allow the examination of the assignee and other witnesses being a violation of clear duty, and the same being within the power of the supreme court to summarily correct by *mandamus*, the order of the court below purporting to confirm the said account of the assignee, and the orders thereafter made in any way interfering with the making of a proper final report by the assignee and the filing objections thereto by the creditors, and the examination of the assignor, assignee, and other witnesses, cannot impair or defeat the remedy by *mandamus*. Such orders are in fact void and ineffective and constitute *apparent* obstacles *only* to the full effect of such writ.

10. By the deed of assignment the bank assets became the property of the creditors, to the amount of their just claims, held in trust for

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

their benefit by the assignee, to be converted into money, under the direction of the court, and applied in liquidation of their claims, and such creditors are entitled at all reasonable times and in all reasonable ways to be informed of the progress of affairs and the state of the business.

11. While the writ of *certiorari* is generally used as an independent writ for the purpose of reviewing action below, it is well adapted to and is frequently used for ancillary purposes only, such as the bringing up a record for use upon the hearing of another matter; and hence, even in the absence of direct authority, it may be used in a case where the court has obtained jurisdiction by other process, and where the presence of a record wholly or partially absent is necessary.

MANDAMUS to D. H. JOHNSON, Judge of the Circuit Court for Milwaukee county. *Peremptory writ granted.*

On the first day of June, 1893, the Plankinton Bank, a state banking corporation of Milwaukee, executed to William Plankinton, its vice president, a voluntary assignment for the benefit of its creditors, and the assignee qualified, and entered upon the duties of his trust. On the 21st of the same month the assignee filed schedules showing the face values of the assets of the bank to be $1,846,851.67, and its liabilities to be $1,430,343.68. Thereafter the assignee proceeded with the administration of the assigned estate, but rendered no account of his administration until July 1, 1898, when, pursuant to an order of court, he filed what purported to be an account of his receipts and disbursements, with a statement of the dividends paid to creditors. The account came up for hearing, after notice by mail to the creditors who had proven their claims, on August 10, 1898. On that day general objections to the account were made by certain creditors, and a motion made to require the account to be made more definite and certain, and the court made no decision, but took the whole matter under advisement until May 9, 1899, when the court, without notice, made an order confirming the report and account of the assignee (except as to the compensation of the assignee)

as a full accounting of all acts up to July 1, 1898, and extended the time for settlement of the estate until January 1, 1900.    On the following day the assignee presented to the court his resignation, and the same was accepted, but not to take effect until the final confirmation of the assignee's account; and the matter was referred to Court Commissioner Ryan to state and report the assignee's account since July 1, 1898, and also the amount of compensation which the assignee should receive; and it was further ordered that until "the allowance and confirmation of said account" and the final discharge of the assignee he continue to perform the duties of his office.

On the said 9th day of May, upon petition of certain creditors, Hon. Fred Scheiber, a circuit court commissioner, made an order requiring the assignee and Frederick T. Day and others, who were alleged to be officers of the insolvent bank, to appear before him on the 17th of the same month, and submit to an examination under oath as to the business affairs and condition of the assignor before and since the assignment.    Immediately following these orders, motion was made by the assignee to set aside the order of Court Commissioner Scheiber, and counter motions were made by the creditors to set aside the orders of May 9th and 10th, and to allow examination of the books and of the bank officers before the court.    Numerous affidavits were submitted on both sides upon the several motions, and on June 9th following the court vacated the order of Court Commissioner Scheiber, denied the motion for examination of the bank officers before the court, and denied the motion to vacate the orders of May 9th and 10th.    On the 7th day of June the court also denied the motion to require the assignee's account to be made more definite and certain, which had been held under advisement since August 10, 1898.    On the 14th of June a further order was made, amending the order of June 7th so as to show that the motion to make the ac-

count more definite and certain was based upon all the records and files in the assignment proceedings, as well as upon affidavits.

In this condition of the record an order to show cause was issued by the chief justice of this court, at chambers, based upon a verified petition of the creditors who had appeared in the circuit court, setting forth the foregoing facts, which order was directed to the circuit judge, and required him to show cause before this court on the 22d of June following why the petitioners should not be allowed to examine the assignee and officers of the bank, and file objections to the assignee's account, and why the orders denying such examination, as well as the orders of May 9th and 10th and of June 7th and 14th, should not be vacated. This motion was argued on the return day, and taken under advisement until July 3d following, at which time the motion was denied. In the meantime, however, a petition had been filed by the appearing creditors, setting forth the facts above stated, and praying for the issuance by this court of a writ of *mandamus* requiring the circuit court to vacate the aforesaid orders, and grant the relief prayed for by the previous petition; and this court on the 28th of June issued an alternative writ of *mandamus* as prayed, directed to the circuit judge, returnable on the 3d of July following, and at the same time, of its own motion, issued its writ of *certiorari* as auxiliary to the writ of *mandamus* to the clerk of said circuit court commanding him to certify and return the account of the assignee, and the various orders in question, and all records and files upon which they were based, in order that the same might be present in court upon the hearing of the alternative writ of *mandamus*. Upon the return day of the two writs the clerk first made a special return to the writ of *certiorari*, seeking to excuse himself from returning the original record on the ground that the trial court had made no order authorizing the transmission of the original papers

to this court; but the objection was summarily overruled, and the original papers were at once returned in obedience to the writ.   Thereupon the circuit judge made his return to the alternative writ as follows:

"It is true that in a certain proceeding of the voluntary assignment of the Plankinton Bank, pending in the circuit court of Milwaukee county, the respondent, as judge of said court, on the 9th day of May, A. D. 1899, made and entered an order confirming an account of William Plankinton, the assignee of said bank, filed in said court on the 1st day of July, 1898.   It is also true that in and by said order time for the settlement of said assigned estate was extended to the 1st day of January, 1900.   It is also true that on the 10th day of May, 1899, the respondent, as judge of said court, did enter a further order in said assignment proceedings, accepting the resignation of William Plankinton as assignee.   It is not true that said order relieved said assignee from the statutory duty of filing an account, but it was the true intent and meaning of said order to refer the taking of said account in the first instance to Hugh Ryan, Esq., the commissioner therein named; that said assignee was to file his account with said commissioner, and said commissioner to act thereon as directed in said order, and report the same for final action to the court.   It is true that said order provided that said William Plankinton continue to act as assignee until his account was stated and settled, and that the appointment of his successor be reserved until said time.   It is true that, after being moved so to do, the respondent, as such judge, refused to vacate and set aside the said orders. It is not true that the order confirming said report was made without notice to the creditors of said assigned estate. Upon that subject, and in reference to the motion to make said account more definite and certain, mentioned in said writ, respondent states the following facts:

"The Plankinton Bank made an assignment June 1, 1893.

In due time an inventory of assets and a list of creditors were filed, as required by sec. 1697 of the Revised Statutes, then in force. Thenceforth, from time to time, many and repeated applications for direction in the administration of the affairs of the bank were addressed to said court or the undersigned by the assignee, and orders made thereon, all of which remain of record in said proceeding. It was impracticable to close the affairs of said bank within six months. The progress of settlement was inevitably slow. Dividends were paid from time to time as money was realized. No requirement was made for the filing of an account by the assignee until the 28th day of May, 1898, when, upon application of a creditor, the assignee was ordered to make and file a report and itemized account on the 1st day of July, 1898. On July 1, 1898, a report and itemized statement of account were filed by the assignee. A notice signed by said assignee, to the effect that he had filed his report containing a statement of his transactions, receipts, and disbursements down to 1st of July, 1898, and should ask for an order of the court confirming said report, and directing his compensation as assignee thus far, on the 16th day of July, 1898, at ten o'clock a. m., was mailed to each and every creditor of said bank, as appears by affidavit on file. Said notice not having been given for a sufficient length of time, the hearing was postponed to August 10, 1898, and a further notice directed to be given. A further notice was then given by the assignee by postal card to the effect that said assignee had filed his account as such in the office of the clerk of this court on the 1st day of July, 1898, and should apply to the court on August 10, at 10 o'clock a. m., for an order confirming the same. Proof of the due and proper mailing of such postal cards to all the creditors of said bank was presented to respondent at the hearing. Objections to said account were filed on and before the 10th day of August, 1898, by several creditors, all of which were general, and referred to

no particular part, subject matter, or item thereof. No objections or exceptions to said report and account were filed by either the *Fourth National Bank of Philadelphia, Pennsylvania,* the *Yankton National Bank of Yankton, South Dakota,* the *First National Bank of Marquette, Michigan,* the *State Bank of Grant County, Wisconsin,* or *Blanchard Bank of Blanchardville, Wisconsin.* An affidavit of Herman A. Wittig, an officer of the *Wittig Plumbing Company,* a creditor of said bank, dated August 10, 1898, was filed, objecting to the allowance of compensation to the assignee, containing also objections to said account, all of a very general nature, not referring to any particular part, subject, or item thereof. Said *Wittig Plumbing Company* had also obtained an order to show cause, returnable at the same time with the hearing upon said account pursuant to the notices given as aforesaid, upon an affidavit of Samuel T. Mock, one of the attorneys for said *Wittig Plumbing Company,* why said account should not be itemized and particularized as in the affidavit of said Mock set forth, and why the petitioning creditors should not have further time to file objections, and for such other and further relief in the premises as might be just and equitable. Objections were also filed by Dodge County Land Company, Mrs. L. J. Fisher, Louis Fisher, and Nickolaus Knoeschel, creditors of said bank, all of a very general character. None of the objections filed raised any questions of fact upon said report and account. The application for the confirmation of the same, the hearing upon the objections thereto, and said order to show cause came on for hearing, and were heard and fully argued before said court, the respondent presiding, on August 10, 1898. During the discussion reference was made to the matter of compensation to be allowed to the assignee. The respondent then stated that he should not pass upon that question upon the present application, but reserve the same until the rendition of the *final account* by said assignee at the winding

up of the assignment proceedings. The whole contention was thereupon taken under advisement, and entry thereof was made in the minutes of the court as follows: 'Assignee's motion to have his report confirmed, and motion to make said assignee's report more definite and certain, came on to be heard. After hearing respondent's counsel, court takes same under advisement.' After fully investigating said account in connection with the orders made and directions given from time to time by respondent as judge of said court in reference to the administration of the said estate, respondent concluded that the same was a full and sufficient account, and that the objections thereto should be overruled, and on the forenoon of May 9, 1899, he so informed Mr. E. H. Bottum, one of the attorneys for said assignee, and directed him to prepare an order to that effect. On the afternoon of the same day, Mr. E. H. Bottum presented to respondent an order allowing and confirming said account as a full accounting on the part of the assignee for all his actions prior to the 1st day of July, 1898, reserving the question of allowance of compensation to the assignee until the final settlement of the trust. Said order being in accordance with the judgment of the respondent, he signed the same, considering that the same fully disposed of all the matters submitted on August 10, 1898, including the motion of said *Wittig Plumbing Company* to make said report more definite and certain.

"It is true that the undersigned, on June 9, 1899, as judge of said court, made and entered an order setting aside a certain order made by Frederick Scheiber, court commissioner, for a certain examination at the expense of the estate; and also that he denied application for an order for a general examination of a like character, at the expense of the estate, upon the petition of a number of creditors by M. M. Riley and Mock & Wittig, their attorneys, verified May 18, 1899.

"It is not true that the respondent has refused to allow

the creditors of said bank an opportunity to examine under
oath the assignee of said bank concerning his administration
as such assignee, and to allow opportunity for filing objec-
tions by creditors to the assignee's account filed on the 1st
day of July, 1898, and a hearing on such objections. All
creditors were duly notified of the filing of said account,
and of application for the confirmation thereof, to be heard
on the 10th day of August, 1898, and then had full oppor-
tunity of filing objections thereto, and being heard upon the
same. All the objections filed related wholly to the suffi-
ciency in form of said account, and no questions of fact
were raised thereon. No application of any kind was made
for the examination of the assignee, or taking of testimony
upon said account, until after the same had been confirmed,
as hereinbefore stated. The orders then asked for were not
based on any objections to any particular portions of said
account, or any particular acts of the assignee, but asked
the court to authorize a general examination of the assignee
and other parties, at the expense of the estate, as to all
transactions during the whole period of six years' adminis-
tration, very many of which transactions had been had and
had taken place under the orders and express directions of
the court, and which remained of record. A general exam-
ination, so conducted before a court commissioner, would
necessarily consume a great deal of time, be cumbersome,
and involve very great expense.

"It has been represented to the respondent, and it has
not been denied, that all the creditors and their attorneys
have had free access at all times to all the books of the bank
and the books kept by the assignee; that it is, in the judg-
ment of this respondent, impracticable in a business of so
large an extent as that of the Plankinton Bank and its as-
signeeship, to render an account so complete and in detail
that it will not require reference, more or less, to the books
of the bank for explanation; that it would be a very great

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

abuse to allow all the transactions of the assignee, from the beginning of his trust, to be gone into and investigated in the form of testimony, involving, at the expense of the estate, a very great outlay without compensatory benefit. Creditors should avail themselves of their opportunity to examine the books of the assignee, and thereupon present to the court specific objections or points upon which investigation is desired or sought, giving the court an opportunity to determine if any, and what form of, examination is required.

" The applications have been made under sec. 1693*b* of the Revised Statutes, providing for the inspection of the books of the assignor, and for his examination. No proper case for such an examination has, in the judgment of the respondent, been shown, nor do the circumstances of the Plankinton Bank, as they are known to respondent from the course of the administration of the assigneeship under his supervision, call for such an examination. Said bank has practically ceased to exist from the making of said assignment. There is no claim or pretense that it has withheld from the assignee any of its assets, or any of its books or papers, or has had any dealings with the same subsequent to that time.

" The indebtedness of said assignor, as to which examination is asked for, has long since become *res adjudicata* under the operation of secs. 1699, 1700, R. S. No subject matter as to the property of the assignor for which inquiry of the assignor is desired is mentioned, nor is the officer of the assignor named who has, or is supposed to have, information concerning the same. Application for such examination being first made six years after the date of the assignment, it is due that a reasonable necessity therefor should be shown, and reasonable limits prescribed.

" In answer to the specific commands contained in said alternative writ, this respondent respectfully informs this court that he has not complied with the same, and, showing cause

for such noncompliance, answers the several commands as follows: First. The command to 'allow the creditors of the Plankinton Bank, through or by their duly authorized attorneys, to fully examine, under oath, before such court, William Plankinton, as assignee of such bank, concerning his administration as such assignee.' Respondent has omitted to comply with such command for the reason that no proper foundations for such an examination have been laid, as hereinbefore stated, and that said account stands confirmed by the order of this court. Second. The command 'to take and consider all proper evidence offered regarding such objections.' Respondent has omitted to comply with this command for the reason that no objections were filed which required the taking of testimony, and no proper foundation is laid therefor, and that said account stands confirmed by the order of this court. Third. The command 'to allow such creditors, by their duly authorized attorneys, to inspect the books of the assignor.' Respondent has omitted to make any order in this respect for the reason that none is required. All the books and papers of the assignor were delivered to the assignee at the time of the assignment, and have been open to the inspection of all creditors and their duly authorized attorneys at all reasonable times since said assignment. Fourth. The command 'to fully examine, under oath, before the respondent as such judge, or before said court, or some judicial officer authorized to act in such matters, under sec. 1693b of the Revised Statutes, the officers and directors of the assignor as to the business affairs and condition of the assignor before and after the making of the assignment, as to all matters appertaining to the assigned property and the assignor's indebtedness.' Respondent has omitted to make any order for such an examination under the statute referred to for the reason that no proper application therefor has been made, and no occasion therefor has been shown to exist, as hereinbefore stated, and for the further reason that there

was not sufficient time to comply with any of said orders before the return day of said writs, said time being limited to two days, not counting Sunday."

To this return the petitioning creditors made answer as follows: " (1) Relators allege that the order of May 10, 1899, made by respondent, referring the account of the assignee of the Plankinton Bank since July 1, 1898, was made without authority of law, and deny that any order was made and filed directing the assignee to file an account with the referee. (2) Relators deny that any such account as is required by the statutes has ever been filed by said assignee, and allege that the account filed was and is insufficient, indefinite, and uncertain, and wholly fails to comply with the requirements of sec. 1701, R. S. (3) Relators allege that the objections made and filed by the creditors to the assignee's report are sufficient, and not too general, in view of the nature and character of said report, and that the motion to make said report more definite and certain was expressly made, as appears on the face of the petition, for the purpose of enabling the creditors to make further and more specifical objections to said report and account, and that said creditors were entitled to have said motion determined and passed upon by respondent before the motion to confirm said account was determined; and relators allege that the objections to such report and account filed by the creditors raised issues of fact as to said report and account. (4) Relators deny that said objections so made and filed by creditors were ever passed upon by respondent, and allege that the only matters taken under advisement on the 10th day of August, 1898, as shown by the record, were the motion to confirm the report, and the motion to make the same more definite and certain, and to allow the creditors more time in which to file additional objections. (5) Relators deny that the order made by Frederick Scheiber, as court commissioner, directed an examination of the assignor or assignee

at the expense of the estate, and allege that the application upon which said order was made is based upon the provisions of sec. 1693*b*, R. S. (6) Relators allege that respondent did, by an order dated June 14, 1899, deny the applications of certain creditors for leave to examine the assignor and assignee. (7) Relators deny that creditors have, since the denial by respondent of the motion to make such report more definite and certain, had any opportunity to file objections to said report, or to be heard in regard to the same. (8) Relators deny that all objections filed to said report relate wholly to the insufficiency in form of said report or account, and allege that issues of fact were specifically raised by said objections. (9) Relators allege that the orders asked for, permitting the examination of the assignor and assignee, were based upon the objections filed to said account, and to specific items thereof. (10) Relators allege that attorneys for the creditors have requested, and been refused by said assignee, information relative to the contents of said report and account. (11) Relators, further answering, show to the court that as to all matters hereinbefore referred to, and for the evidence as to and proof of each and every allegation, denial, and statement of fact herein, relators hereby refer to the record in the above-entitled matter, and in the matter of the assignment of the Plankinton Bank, now on file in this court; and said records, and each and every part thereof, are hereby for all proper purposes made a part of this answer."

Upon the filing of the answer motion was made by counsel for the circuit judge to send the issues of fact raised by the answer to the circuit court for Milwaukee county for trial under the provisions of sec. 3452, Stats. 1898, but the motion was denied, and the hearing proceeded upon the record, and the matter was taken under advisement until the 5th day of July following, when judgment was entered adjudging that the alternative writ of *mandamus* be made peremptory, and that the record sent up in response to the

writ of *certiorari* be returned to the clerk. At the same time the following statement of the conclusions reached by the court was filed:

"In this case it is decided:

"(1) That the account filed by the assignee July 1, 1898, is not the final report and account contemplated and required by sec. 1701, Stats. 1898.

"(2) A final order settling an assignee's account, under sec. 1701, Stats. 1898, cannot properly be made until the duties of the trust have been fully performed. *Magnus v. Sleeper*, 69 Wis. 219.

"(3) Not only was the account which was filed July 1, 1898, not in fact a final account, under sec. 1701, Stats. 1898, but it was so treated upon the hearing by the circuit court, for it appears by the return that upon said hearing, August 10, 1898, the judge of that court expressly recognized the same as merely an interlocutory account by stating that he reserved certain matters until the rendition of a 'future final account by the assignee and the winding up of the assignment proceedings;' and the creditors acted thereafter under the belief that a final account was thereafter to be filed until the entry of the order of May 9, 1899, without notice, which purports to approve said account as a final account.

"(4) No final report and account, within the meaning of the statute, having been filed, the rights of a creditor to have an inspection of the books of the assignor, and an examination of the assignor and other witnesses under sec. 1693b, were absolute, and not discretionary.

"(5) Aside from the statute, the right of a creditor to have an examination of the assignee under oath as to his dealings with the estate, under reasonable restrictions, is absolute, and a refusal to allow such examination prior to the approval of the final account can only be regarded as an abuse of discretion.

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

"(6) Under the superintending power given this court by the constitution this court may, by *mandamus*, compel an inferior court to perform a duty imposed by the statute which is not discretionary in its nature, and may also compel action even in cases where discretion is to be exercised, when it clearly appears that such discretion has not in fact been exercised, or that action has been taken in manifest disregard of duty or without semblance of legal powers, and where it further appears that there is no remedy by appeal, or that such remedy if existing is entirely inadequate, and the exigency is of such an extreme nature as to justify the interposition of the extraordinary superintending powers of this court.

"(7) The refusal to allow the examination of the assignee and other witnesses being a violation of clear duty, and the same being within the power of this court to summarily correct by *mandamus*, the order of the court below purporting to confirm the said account, and the orders thereafter made in any way interfering with the making of a proper final report by the assignee and the filing objections thereto by the creditors, and the examination of the assignor, assignee, and other witnesses (which orders, being unappealed from, are now claimed to be *res adjudicata* and to constitute insuperable objections to the effective exercise of the power of this court by *mandamus*), cannot impair or defeat the remedy by *mandamus*, and the court below will be directed by the peremptory writ to vacate all such orders.

"(8) The alternative writ heretofore issued will be made peremptory, with specific directions to vacate the orders referred to in the last paragraph, it being considered that the same are in fact void and ineffective, and that they constitute apparent obstacles only to the full effect of the writ.

"An opinion will be prepared and filed in the near future more fully expressing the views of the court."

For the relators there were briefs by *M. M. Riley*, attor-

ney, and *J. V. Quarles, Joseph B. Doe*, and *Moritz Wittig*, of counsel, and oral argument by *Mr. Riley, Mr. Quarles, Mr. Doe, Mr. Wittig*, and *Mr. C. E. Estabrook*. They contended, *inter alia*, that the jurisdiction invoked has been one recognized by a long line of decisions of this court, and, though seldom resorted to, its existence and the right of the court to exercise it, when occasion requires, has never been doubted or questioned. *Att'y Gen. v. Blossom*, 1 Wis. 277; *Att'y Gen. v. R. R. Cos.* 35 Wis. 425–608; *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 441; *State ex rel. Lamb v. Cunningham*, 83 Wis. 90; *Jackson v. State*, 92 Wis. 422. It appears to have been deliberately settled in Wisconsin that, by the second clause of sec. 3, art. VII, Const., the people of this state bestowed on the supreme court a third branch of jurisdiction quite independent of the other two, and if a proper emergency exists for the exercise of this supervisory control, it will be no answer to say that the case is such that redress might be had under either of the other branches of jurisdiction. *Att'y Gen. v. Blossom*, 1 Wis. 182; *Cooper v. Mineral Point*, 34 Wis. 182; *Att'y Gen. v. R. R. Cos.* 35 Wis. 512; *Att'y Gen. v. Eau Claire*, 37 Wis. 400; *State ex rel. Wood v. Baker*, 38 Wis. 77; *In re Pierce*, 44 Wis. 420; sec. 2406, R. S. 1878. As in the case of original jurisdiction, this court may and undoubtedly will impose upon the exercise of its supervisory control such reasonable limitation as will comport with the convenience and dignity of the tribunal. It will not permit this great prerogative writ to become cheap or common by being exercised in cases where other existing remedies would be entirely adequate. *State ex rel. Att'y Gen. v. Circuit Court*, 97 Wis. 15. The superintending authority over all inferior courts expressly conferred upon the supreme court by the constitution will be exercised, not only to keep them within their jurisdiction, but also to restrain any oppressive exercise of power, whereby the rights of the public or of individual citizens will be in-

vaded. *Upjohn v. Richland Board of Health*, 46 Mich. 544;
*State ex rel. Bayha v. Kansas City Court of Appeals*, 3 L. R.
A. 476–480; *State ex rel. St. L., K. & S. R. Co. v. Wear*, 33
L. R. A. 348; *State ex rel. Amsterdamsch Trustees Kantoor v.
Superior Court*, 37 L. R. A. 111; *Lansing Lumber Co. v. Ing-
ham Circuit Judge*, 108 Mich. 305; *Quimbo Appo v. People*,
20 N. Y. 531–542. The orders complained of were entered
in a case of a voluntary assignment, purporting to be for the
benefit of creditors. In such case there is no adversary party.
The assignment is practically a deed of trust and thereby
the creditors are the equitable owners of the fund. *Miller's
Appeal*, 35 Pa. St. 481; *Chemical Nat. Bank v. Armstrong*,
16 U. S. App. 537.

For the respondent there were briefs by *Winkler, Flanders,
Smith, Bottum & Vilas*, and oral argument by *J. G. Fland-
ers, E. H. Bottum*, and *F. C. Winkler*. They contended, *inter
alia*, that the proper function of the writ of *mandamus* is so
well recognized and established by the decisions of the court,
in harmony with the great mass of decisions both in this
country and in England, that there is no room to question
the sphere within which the court is capable to act. *Man-
damus* can only be resorted to to compel the doing of specific
acts of absolute duty by inferior tribunals upon two con-
ditions: first, that the subject matter is beyond the reach of
writ of error or appeal; second, that the command conveyed
enforces an absolute duty in which neither the judgment nor
discretion of the subordinate court is involved. *People ex rel.
Cannon v. Superior Court*, 18 Wend. 575; *Ex parte Nelson*,
1 Cow. 417, 423; *Jansen v. Davison*, 2 Johns. Cas. 72; *Peo-
ple ex rel. Hodgkinson v. Stevens*, 5 Hill, 616; *In re Atlantic
C. R. R.* 164 U. S. 633; *State ex rel. Buchanan v. Kellogg*,
95 Wis. 672, 679. Where a court acts within the range of
its judicial authority *mandamus* will not lie to correct an
erroneous judgment. *People ex rel. Wilson v. Sup'rs*, 12
Johns. 414; *Ex parte Nelson*, 1 Cow. 417; *State ex rel. Com-*

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

*stock v. Joint Sch. Dist.* 65 Wis. 631, 638; *State ex rel. Buchanan v. Kellogg,* 95 Wis. 672, 679; *State ex rel. Spense v. Dick,* 103 Wis. 407. Done in good faith and under the direct order of the court, the transactions of the assignee are binding on the creditors. *Ray v. Hixon,* 90 Wis. 39. The word "may" in sec. 1693*b,* Stats. 1898, does not give an absolute right; it is only where the public rights or interests are concerned, or where the public, or third persons, have a claim *de jure,* that the word "may" should be construed to mean "must" or "shall." *Cutler v. Howard,* 9 Wis. 309; *Market Nat. Bank v. Hogan,* 21 Wis. 317, 319.

The following opinion was filed September 5, 1899:

WINSLOW, J. The constitution of this state (sec. 3, art. VII) provides: "The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state; but in no case removed to the supreme court shall a trial by jury be allowed. The supreme court shall have a *general superintending control over all inferior courts;* it shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same."

Very early in the history of this court and of the state the question of the construction and meaning of this section was presented to this court, and learnedly discussed by Justice SMITH in the opinion in the case of *Attorney General v. Blossom,* 1 Wis. 317. That case was an information filed in this court by the attorney general in the nature of a *quo warranto* against Blossom and others, and motion was made to dismiss the cause for lack of jurisdiction, on the ground that the granting of the writs in the third clause of the constitutional provision above quoted gave no additional jurisdiction, but that those writs were simply named as instrumentalities by which the appellate power and the superin-

tending control were to be exercised. This contention was
repudiated by the court, and the conclusion distinctly reached
and clearly stated that the constitutional provision contained
three separate grants of jurisdiction to this court, namely,
(1) the appellate jurisdiction; (2) the superintending control
over inferior courts; and (3) the original jurisdiction to be
exercised by means of the writs named in the third clause
to protect the sovereignty of the state, preserve the liberty
of the people, and secure the rights of its citizens. In dis-
cussing the second clause of the section, namely, "the su-
preme court shall have a general superintending control
over all inferior courts," it was said: "This sentence con-
tains a clear grant of power. We will not undertake to say
that without this grant the power would not be in the court.
It is not necessary to discuss that question. We are endeav-
oring to arrive at the proper construction of the law. It is
a grant of power. It is unlimited in extent. It is indefinite
in character. It is unsupplied with means and instrumen-
talities. The constitution leaves us wholly in the dark as to
the means of exercising this clear, unequivocal grant of
power. It gives, indeed, the jurisdiction, but does not pre-
tend to intimate its instruments or agencies." Again, in
discussing the third clause of the section, it was said: "Here,
also, is a distinct grant of power. The first of the section
is restrictive,— one of limitation merely. The two last are
clear grants of the power, the one of which gives the power
of a superintending control over inferior courts; the other
gives the power to issue certain writs in appropriate cases,
and to hear and determine the same."

The section came before this court again in the great case
of *Attorney General v. Railroad Cos.* 35 Wis. 425, and the
exhaustive discussion by Chief Justice RYAN in that case of
the original jurisdiction of this court under the third clause
of the section will ever stand as a monument to the legal
learning and ability of that distinguished justice. In that ·

discussion the conclusions reached in the *Blossom Case* to the effect that there were three separate and independent grants of jurisdiction in the section quoted were fully approved, and the court said (page 515 *et seq.*): "The framers of the constitution appear to have well understood that with appellate jurisdiction the court took all common-law writs applicable to it, and with superintending control all common-law writs applicable to that; and that failing adequate common-law writs, the court might well devise new ones, as Lord Coke tells us, as 'a secret in law.' Hence the constitution names no writ for the exercise of the appellate or superintending jurisdiction of the court." And again: "The grant of original jurisdiction is one entire thing, given in one general policy, for one general purpose, though it may have many objects and many modes of execution. So it is of the appellate power. So it is of the superintending control. There are three independent and distinct grants of jurisdiction, each compact and congruous in itself; each a uniform grant of analogous remedies, though to be exercised in several ways, by several writs, in legal and equitable proceedings on many objects, in great variety of detail. The constitution wisely, almost necessarily, stopped with the general grants of jurisdiction carefully distinguished, and left details to practice and experience. . . . The three grants of jurisdiction proceed on one policy: appellate jurisdiction to decide finally all ordinary litigation; *superintending jurisdiction over all other courts to control the course of ordinary litigation in them;* and, outside of these, original jurisdiction of certain proceedings at law and in equity, to protect the general interests and welfare of the state and its people, which it would not do (to quote SMITH, J.) to dissipate and scatter among many inferior courts."

These propositions, so clearly laid down, have never been questioned, nor does it seem that they are open to question even in the absence of decisions upon the subject, and look-

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

ing at the language of the section alone. It must be regarded as settled, therefore, that by the constitutional grant of "a general superintending control over all inferior courts" this court was endowed with a separate and independent jurisdiction, which enables and requires it in a proper case to control the course of ordinary litigation in such inferior courts, and was also endowed with all the common-law writs applicable to that jurisdiction. What those writs are, and the manner of their use, are questions which have not as yet been directly presented or decided, but they are necessarily involved in the present case, and hence must now be considered. That the makers of the constitution used the words in question understandingly, and with a specific meaning, and not as a mere rhetorical flourish or high sounding form of words, can admit of no doubt. Only a superficial knowledge of the growth and development of the English judicial system is necessary to determine what that meaning was and is. The English court of king's bench had a superintending jurisdiction over all the inferior courts of the realm, which it freely exercised by the use of well-defined writs from very early times. The Norman idea was that the king was the fountain of all justice, and hence, when an inferior court exceeded its jurisdiction, or refused to act within its jurisdiction to the prejudice of a suitor, and no other remedy was provided, application could be made by the aggrieved party to the king's court to restrain or compel action. The king's bench was peculiarly the king's court, in which he sometimes sat himself, and was always supposed to sit when not personally present. It succeeded in this respect the very ancient *aula regis* when (near the close of the Norman period) that court was divided into the courts of the king's bench, common pleas, and exchequer. Being the king's court, it was natural, if not inevitable, that the king's sovereign power of causing justice to be done to his subjects in the course of litigation in inferior courts

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

should be administered by and through that court. Black-stone says of this court (3 Comm. ch. 4, p. 42): "The juris-diction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove the proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition. It takes cognizance both of criminal and civil cases; the former in what is called the crown side or crown office, the latter in the plea side of the court."

It is very apparent that when the makers of the constitu-tion used the words "superintending control over all inferior courts" they definitely referred to that well-known superin-tending jurisdiction of the court of king's bench. In England it was a branch of the king's power lodged with the king's court; in this country it is a branch of the sovereign power of the people, committed by them as a sacred charge to this court, not to be exercised upon light occasion, or when other and ordinary remedies are sufficient, but to be wisely used for the benefit of any citizen when an inferior court either refuses to act within its jurisdiction, or acts beyond its juris-diction to the serious prejudice of the citizen. 2 Spelling, Extr. Relief, § 1388. The two great writs by which this superintending jurisdiction was principally exercised by the court of king's bench were the writs of *mandamus* and pro-hibition; the one directing action by the inferior court, and the other forbidding action. Of these writs and their peculiar office, when directed to an inferior court, Blackstone says (3 Comm. ch. 7, p. 110): "For it is the peculiar business of the court of king's bench to superintend all other inferior tribunals, and therein to enforce the due exercise of those judicial or ministerial powers, with which the crown or leg-

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

islature have invested them; and this not only by restraining their excesses, but also by quickening their negligence, and obviating their denial of justice." In addition to these two prerogative writs, the superintending control over inferior courts was at common law sometimes exercised by means of the writs of *certiorari* and *procedendo*, the first of which issued either from the king's bench or from chancery, and the second from the court of chancery alone, which court was also invested with a part of the superintending power. Harris, Certiorari, § 3, p. 4; 3 Bl. Comm. ch. 7, p. 109. As to the writ of *certiorari*, it is used so frequently, and its ordinary functions are so well known, that discussion of it is unnecessary; and as to the writ of *procedendo* it may be said that it has practically fallen into disuse, its functions being fully performed by the writ of *mandamus*. High, Extr. Leg. Rem. (3d ed.), §§ 147, 148. It would hardly be helpful to enter into any extended investigation as to whether there were other writs at common law by which the superintending power was exercised. The writs already named form a veritable arsenal of legal weapons by means of which all ordinary excesses or defaults on the part of inferior courts which call for the exercise of such power can be corrected and controlled. Nor, for the same reason, is it necessary to consider the suggestion of Chief Justice RYAN in the *Railroad Cases* to the effect that the court may devise new writs in case of the inadequacy of the common-law writs to meet the case in hand. The conclusion is inevitable that with the constitutional grant of superintending control this court took at the same time all the ancient writs necessary to enable it to exercise that high power including certainly the writs of *mandamus*, prohibition, *certiorari*, and *procedendo*. The statute which purports to grant to the supreme court the power to issue writs of " prohibition, *supersedeas, procedendo*, and all other writs and process not specially provided for by statute which may be necessary to enforce the due adminis-

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

tration of right and justice throughout the state " (sec. 2406, Stats. 1898), can hardly be said to have given the court any additional instrumentalities for the exercise of the superintending jurisdiction, because this court possessed those writs as a necessary adjunct of the constitutional grant of a superintending control. Nevertheless, the section is helpful as indicating the legislative intention that no doubt should be left as to the power of the court to issue any writs necessary to make effective the three separate grants of jurisdiction made to it by the constitution. Nor does the fact that in the third clause of the constitution certain writs are named, including *mandamus* and *certiorari*, as the means by which original jurisdiction is to be exercised, militate against the position that the grant of superintending control carried with it all necessary writs applicable to *its* efficient exercise, for the plain reason that *mandamus* and *certiorari*, though entirely suitable and efficient as superintending writs, are equally well adapted for use in the exercise of the original jurisdiction, and in fact necessary to make that jurisdiction complete and effective. Further, it may be said that said last-named writs are frequently used in the exercise of the appellate jurisdiction of this and other supreme courts, but they are not thereby confined to such use.

It was suggested at the bar upon the argument of this case that this "superintending control" was a branch of the jurisdiction of this court which had practically remained dormant during the existence of this court, but a very slight examination of the decisions will demonstrate that this is an erroneous idea. The examples may not be numerous, and it is to the credit of the trial courts that such is the fact, but they are entirely sufficient. It is true, the subject has never been fully discussed, and the jurisdiction has been exercised without being classified or named, but the fact remains that it has certainly been exercised by the use of the writs of *mandamus* and prohibition. Thus, in *State ex rel.*

*Brownell v. McArthur*, 13 Wis. 407, the writ of *mandamus* was granted compelling a circuit judge to make an order changing the venue of an action, and in *State ex rel. Spence v. Dick, ante*, p. 407, the same judgment was rendered. In *State ex rel. Att'y Gen. v. Circuit Court*, 97 Wis. 1, a writ of prohibition was granted preventing the further prosecution of certain contempt proceedings in the circuit court because such court was acting in excess of its jurisdiction. Doubtless other cases could be cited in this court where the superintending control has been exercised by this court, but these will suffice to show that such power has not lain dormant. Instances of the exercise of this power by the circuit court under its constitutional grant of "superintending control" over inferior courts (Const. Wis. art. VII, sec. 8) may also be cited. Thus, in *State ex rel. Marsh v. Whittet*, 61 Wis. 351, the circuit court, by *mandamus*, compelled a justice of the peace to correct the entries in his docket to accord with the facts, and it was held that the circuit court had the power under its grant of supervisory control.

There seems to have been no extended discussion of the general character and limits of the superintending jurisdiction of supreme courts in the decisions of other states, although the constitutions of Missouri, Michigan, and Colorado contain provisions very similar to our provision granting to the supreme court superintending control over all inferior courts; while in Alabama, Arkansas, Iowa, North and South Carolina the superintending control is given in somewhat different phraseology. However, we have found no decisions nor intimations contradictory to the views hereinbefore expressed, while we find the writs of *mandamus* and prohibition to have been frequently used in the exercise of this jurisdiction. Thus, in *State ex rel. Bayha v. Philips*, 97 Mo. 331; *S. C. State ex rel. Bayha v. Kansas City Court of Appeals*, 3 L. R. A. 476, note, *mandamus* was used under the superintending power to compel an inferior court to reinstate a

cause, and it was said of the superintending control: " The control granted to the court in the particulars mentioned is fettered by no restriction or limitation; it is as broad as the exigency of the case demands." And in *St. Louis, K. & S. R. Co. v. Wear*, 135 Mo. 230, 33 L. R. A. 341, a writ of prohibition was granted to prevent an inferior court from proceeding to exercise unauthorized power. See a discussion of superintending control in 2 Leg. Adv. (April, 1899), 333. See, also, 2 Spelling, Extr. Relief, § 1394, and cases cited in note 2, and cases cited in note to *State ex rel. Bayha v. Kansas City Court of Appeals*, 3 L. R. A. 476.

Having thus demonstrated that the constitutional grant of superintending control over all inferior courts vested in this court an independent and separate jurisdiction enabling and requiring it, upon sufficient occasion, by the use of all proper and necessary writs to promptly restrain the excesses and quicken the neglects of inferior courts in the absence of other adequate remedy, the question arises whether the case presented is one within that jurisdiction, and, if so, whether *mandamus* is an appropriate and efficient remedy. The present controversy arises out of the administration of the affairs of an insolvent bank with nominal assets of over a million and a half, and debts nearly as large. By the deed of assignment these assets became substantially the property of the creditors to the amount of their just claims held in trust for their benefit by the assignee, to be converted into money, under the direction of the court, and applied in liquidation of their claims. The creditors were the real owners, the assignee their trustee, and, in a sense, their mere agent. While they were not entitled to officiously intermeddle with the business, nor dictate to the assignee, they were entitled at all reasonable times and in all reasonable ways to be informed of the progress of affairs and the state of the business. These propositions seem self-evident from the very nature of the relations of the parties to the subject matter, and from the

care which is taken by the statute to arm the creditors with all necessary power to intervene in the proceedings, to examine the assignor and his books; to investigate, by the examination of the assignor and other witnesses, the business affairs of the assignor, both before and after the assignment; to compel the rendering of an account by the assignee; to be heard upon the settlement of the account; and to require the removal of the assignee by the court. Secs. 1693b, 1701, 1702, Stats. 1898.

We are compelled to say in the present case that the fundamental rights of the creditors seem to have been entirely ignored or denied by the assignee and by the court, and the position seems to have been taken that the business was the business of the assignee, in which the creditors were only remotely interested, if interested at all. Five years and more passed without the rendering of any account by the assignee, and these years were full of many business transactions, some of them of considerable magnitude, including the compromise of large claims, the purchase and closing out of a large stock of furniture upon execution, and the payment of senior execution creditors from the proceeds. When at last, in compliance with an order of court, the assignee rendered a supposed account of his long stewardship, he failed utterly to comply with the requirement of the statute. By sec. 1701, Stats. 1898, his account and report must consist of (1) an itemized and verified statement of the property by him received, (2) the manner of his dealing therewith, (3) the amount of money realized by him, (4) the condition of the property and funds in his possession, (5) the names and residences of the assignor's creditors, (6) the dividends paid them, (7) his receipts and disbursements, and (8) his claim for compensation. The account filed by the assignee consisted principally of a transcript of his cash account, which is nowhere footed, and which utterly fails to state the property received by him, the manner of his dealing therewith,

and from which the amount realized and the condition of the funds and property in his possession can only be determined, if at all, by long and patient examination by expert accountants. It is an account better calculated to obscure and confuse the situation than to render it plain. It was an account that did not comply with the statute, and which any creditor was entitled to have made definite and certain before being required to file specific objections to it. Upon the hearing of the so-called account certain creditors moved that the same be made more definite and certain, so as to comply with the requirements of the statute. There can be no question of the absolute right of any creditor to demand that the assignee make and file an account answering the requirements of the statute, before he is required to make special objections to any particular items of such account. But the circuit judge took the motion and the account under advisement, stating that should reserve the question of the assignee's compensation until the rendering of *the final account* of the assignee. No further action was taken by the court until the 9th day of May following, when, without notice to any creditor, and without disposing of the motion to make the account definite and certain, an order was made confirming the account as a full accounting of all acts of the assignee up to July 1, 1898, except as to his compensation; thus, in effect, closing every avenue by which creditors could hope to investigate the assignee's conduct of affairs. After this action, taken, as we must conclude, in utter disregard of the rights of the creditors to examine and object to the account required by the statute, orders were made in rapid succession denying the creditors the right to examine the assignee and the officers of the assignor, accepting the resignation of the assignee, but continuing him in the discharge of his duties, vacating an order for the examination of the officers of the assignor made by a court commissioner, denying the motion to make the account

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

more definite and certain, and denying a motion to vacate the order confirming the account of the assignee. If any additional order could have been devised which would more completely and thoroughly prevent the investigation of the transactions of the assignee prior to July 1, 1898, we do not know what it could be. Notwithstanding the fact that the creditors had an absolute statutory right to an account substantially conforming to the requirements of sec. 1701, Stats. 1898, and notwithstanding the fact that some of them had moved the court to require the making of such an account, they now found themselves out of court, and the doors barred to all future entrance except for the purpose of considering the question of the compensation of the assignee.

It seems to us manifest that there has been in this case a denial of several absolute and valuable rights which the law guarantees to the creditors of an insolvent estate. They had a statutory right to have an account rendered by the assignee in substantial conformity with the terms of the statute; they had a statutory right to file objections to *such* an account after examination thereof (sec. 1701); they had a statutory right to inspect the books of the assignee, and examine the officers of the assignor and other witnesses prior to the final adjustment and approval of such account (sec. 1693b; *Berles v. Comstock*, 104 Mich. 129); they had a common-law right, arising from their relations to the property and to the assignee, to examine the books of the assignee, and the assignee himself, prior to the final approval of such account. All these rights were valuable and absolute rights, to be exercised within reasonable limits, but which, in the present case, were wholly denied to the creditors; and, unless there be adequate remedy for such denial in the regular exercise of the appellate jurisdiction of this court, it is difficult to see why the superintending jurisdiction should not be exercised to quicken the neglect or refusal of the circuit court, and compel it to act within its jurisdiction. Merrill, Mandamus, § 204.

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

But it is argued that, inasmuch as an appeal lies from the order settling the assignee's account (sec. 1701), as well as from the other orders made in the assignment proceedings (sec. 1702*i; In re Gilbert*, 94 Wis. 108); there can be no remedy by *mandamus*. The general rule of law undoubtedly is that *mandamus* will not lie where there is a remedy by appeal or writ of error. Merrill, Mandamus, § 201; 2 Spelling, Extr. Relief, § 1390; *State ex rel. Spence v. Dick, ante*, p. 407. But the remedy by appeal must be substantially adequate in order to prevent relief by *mandamus*.

If it appears that an appeal will not be an adequate remedy, *mandamus* may still issue, in the discretion of the court. Merrill, Mandamus, § 201; *Merced M. Co. v. Fremont*, 7 Cal. 130; Hawes, Jur. § 141. In the present case it is quite apparent that appeals from the orders complained of would in all reasonable probability constitute no remedy to the creditors. The assignment was made June 1, 1893. A large portion of the assets of the bank consisted of commercial paper executed prior to that date, and necessarily maturing in the summer and early fall of 1893. Such of the paper as is still uncollected and has not been sued on will become barred by the statute of limitations within a few months. Furthermore, the long lapse of time which has occurred since the assignment renders it almost certain that rights of action are daily lapsing. Appeals from such orders could not, in the ordinary course of appellate proceedings, be heard and decided before late in the coming autumn or in the winter of 1899. It is very plain that, if the creditors are to exercise their rights with any prospect of benefit, they must exercise them promptly. The delay attending upon the presentation and consideration of an appeal would probably be fatal to any effective relief.

Again, it is said that the orders in question are discretionary in their nature, and reliance is placed upon the well-known principle that *mandamus* will not lie to control the exercise of discretion. It has already been shown that the

rights which have been denied to the creditors here were absolute rights, and not dependent upon the discretion of the court. True, the rights must be reasonably exercised, and in this respect there may exist some degree of discretion in the trial court; but the case fails to show that the objecting creditors have chosen an unreasonable time or manner for the exercise of their rights, or that they have been guilty of laches. They set the proceedings in motion to require an accounting by the assignee more than a year ago, and cannot be held accountable for the long delays which have occurred since that time. A writ of *mandamus* compelling the trial court to accord to the creditors the exercise of their clear rights in the assignment proceedings cannot, therefore, be held an interference with judicial discretion, when no attempt is made to control the action of the court, or prescribe its judgment, after such rights have been exercised. Merrill, Mandamus, § 204. Furthermore, it is not entirely accurate to say that no act involving discretion can be controlled or corrected by *mandamus*. Where it clearly appears that discretion has been not merely abused, but not exercised at all, or that the action taken by the inferior court is without semblance of legal cause, and no other adequate remedy exists, *mandamus* will lie to compel the specific action which should have been taken. Merrill, Mandamus, § 40; *State ex rel. Buchanan v. Kellogg*, 95 Wis. 672. Such cases are, however, more apparent than real exceptions to the rule, because, when only one course is open to the court upon the facts presented, the pursuance of that course becomes the plain and absolute duty of the court, and the refusal becomes, in effect, a failure to perform a duty within its jurisdiction. It is not meant by this, however, that *mandamus* will be used to perform the functions of appeal or writ of error, as seems to have been the tendency in the supreme courts of Alabama and Michigan. The duty of the court must be plain, the refusal to proceed within its juris-

diction to perform that duty must be clear, the results of such refusal prejudicial, the remedy, if any, by appeal or writ of error utterly inadequate, and the application for relief by *mandamus* speedy and prompt, in order to justify the issuance of the writ.

This brings us to the consideration of another objection made by the respondent, namely, that the various orders made by the court below confirming the assignee's account and refusing the applications for examination cannot be reversed upon *mandamus*, and hence that, being unreversed and unappealed from, they constitute complete bars to any relief by *mandamus*. This difficulty, also, is more apparent than real. While it is true that the legitimate function of the writ of *mandamus* is to compel action by the inferior court, rather than to reverse action already taken, it would be gross absurdity to hold that, after refusal to perform a plain duty within its jurisdiction, the inferior court could nullify the constitutional grant of superintending power by the entry of any order or orders. This court holds its power under no such uncertain terms. Those powers are not dependent upon the speed with which the trial court enters orders. If it becomes necessary, in the due discharge of its power of superintending control, that orders of the inferior court be vacated, this court will not hesitate to compel the vacation of such order by the inferior court by so framing its writs of *mandamus*. With the superintending control and the attendant writs this court took all the power necessary to make that control and those writs effective, and its arm is not nerveless because no writ may be found in the form books so framed as to meet the emergency. The writ will be framed to meet the exigencies of the case, and the court will discharge the duties of the trust reposed with it by the people, though it becomes necessary to modify and enlarge the terms of the ancient writ.

And so we have reached the conclusions briefly stated in

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

the memorandum decision which was filed at the time of the decision of the case. There are yet remaining, however, two matters which require discussion. When the application for the writ was presented to us, there at once arose an apparent difficulty, resulting from the fact that the record in the court below was not before us, and would not be brought up by the writ. It is true that the petition set forth many of the facts, and contained copies of the orders complained of, and of the affidavits on which they were based, but the assignee's account was not here, nor the minutes of the clerk, and it seemed quite apparent that the entire record should be before us upon the hearing upon the merits. Upon consideration, the court, of its own motion, issued with the alternative writ of *mandamus* its writ of *certiorari* directed to the clerk of the trial court commanding him to return the original records for the sole purpose of placing before us the entire record as it existed in the trial court. The writ of *certiorari* was thus issued as ancillary only to the writ of *mandamus*. While the writ of *certiorari* is generally issued as an independent writ for the purpose of reviewing action below, it is well adapted to, and is frequently used for, ancillary purposes only, as a means of bringing up a record for use upon the hearing of another and different writ. "As a matter of practice in England and in this country, the writ of *certiorari* is granted as an auxiliary process in the courts where causes have been removed by other remedy." Harris, Certiorari, § 9. In the courts of the United States it is commonly used as auxiliary to the writ of *habeas corpus* for the sole purpose of bringing up the record. *Ex parte Yerger*, 8 Wall. 85; *Ex parte Lange*, 18 Wall. 163; *Ex parte Royall*, 112 U. S. 181. It is also used in aid of a writ of error or appeal where diminution of the record appears. *Fisher v. McNulty*, 30 W. Va. 186; *State v. Randall*, 87 N. C. 571; *Field v. Milton*, 3 Cranch, 514; *Fowler v. Lindsey*, 3 Dall. 411. But, even in the absence of direct authority, the writ

is so well adapted for such use that we should feel no hesitation in using it in a case where the court has obtained jurisdiction by other process, and where the presence of the record is necessary, and it is wholly or partially absent.

The remaining question referred to arose upon the hearing of the return to the alternative writ. It was claimed by the respondent that issues of fact were raised by the return to the writ and the answer to said return, and that the said issues must be tried either in the circuit court for Milwaukee county or some other circuit court, as provided by sec. 3452, Stats. 1898. That section provides that issues of fact in a *mandamus* proceeding in this court shall be tried in the circuit court of the county within which the material facts are alleged to have arisen, or in some other circuit court to which this court shall, in its discretion, for cause shown, order such trial. This contention was summarily overruled for two entirely sufficient causes: First. There are no true issues of fact raised by the return and answers thereto. The issues raised, upon analysis, will all be found to be issues of law. There are no material contentions raised as to the rulings of the court, nor as to the papers upon which those rulings were based, but the sole material contentions are as to the legal effect of those rulings, and the legal rights of the parties as shown by the record. Second. Even admitting that issues of fact were raised by the answer, we cannot admit that the legislature has any power to deprive this court of any part of its constitutional jurisdiction to fully hear and try such questions. By the constitution this court was given power to exercise fully and completely the jurisdiction of superintending control over all inferior courts. This power carries with it not only the writs necessary to its exercise, but the right to hear and determine the cause when the writ has brought it before the court. No part of that power can be taken away by a statute. This court will always pay all due deference to the legislative will, and

State ex rel. Fourth Nat. Bank of Philadelphia and others vs. Johnson.

upon mere questions of practice or orderly proceeding will heed and conform to the statute; but when the statute invades or attempts to take away any of the constitutional powers of the court the court would be untrue to itself, and to the people, from whom it holds its commission, if it permitted the statute to control. As said in *Klein v. Valerius*, 87 Wis. 54, "It must be remembered that this court as well as the legislature gets its judicial power and jurisdiction directly from the constitution." It may well be that when a *bona fide* issue of fact is presented in a *mandamus* proceeding, and one which involves the hearing of oral evidence outside the record, this court will, for convenience, order the preliminary trial of such issue to be held before the circuit court, the findings or verdict being subject to final revision by this court, as has been done in several cases. *State ex rel. Field v. Saxton*, 14 Wis. 123; *State ex rel. Covenant M. B. Asso. v. Root*, 83 Wis. 667. But the statute cannot be considered as obligatory upon the court, especially in a case like the present, where the questions at issue arise upon the record alone, and where the course presented by the statute would amount to a denial of relief. Such a holding would amount to a practical abdication of constitutional powers, or rather, perhaps, to a submission to legislative invasion of constitutional powers.

No costs will be awarded against the respondent, but the fees of the clerk of this court will be taxed and paid out of the assigned estate.

*By the Court.*— Judgment is ordered that a peremptory writ of *mandamus* issue in accordance with this opinion, and that the record transmitted to this court in response to the writ of *certiorari* be at once remitted to the trial court.